Good morning, your honors. May it please the court. My name is Kirsten Jackson. I'm with the law firm of Kasowitz, Benson, Torres & Friedman. I'm pro bono counsel for the appellant, John Gallagher, whose brother drove him all the way from San Diego to be here this morning. And if you wouldn't mind, I'd like to reserve the final five minutes of my time for rebuttal. This appeal presents two principal issues for the court to decide de novo. The first issue is whether the district court erred in disposing of Mr. Gallagher's retaliation claim on summary judgment. We believe that it did. There was, at the very minimum, enough evidence to raise an inference that Mr. Gallagher's previous two lawsuits against the Port District influenced its decision to deny him Anchorage. There was also evidence that the Port District's purported reason for denying Mr. Gallagher Anchorage that his permit expired. It's pretextual in light of the language on the face of the permit that indicated that there was no expiration date. We therefore ask this court to reverse with instructions to the district court to go to trial on these factual issues. Did the contract require that he get a permit without an expiration date? I don't see where the contract, the agreement, or whether the author or judgment promises that. The specific language of the contract is, the Port District shall issue a permit to Plaintiff John Gallagher to anchor in Area A-9 as alternative long-term, well, alternative free long-term Anchorage area subject to all the regulations applicable to A-8. So, by referencing the permit, we believe that incorporates the language that there is no expiration date, but you can also look at the... How do you get that? I'm sorry, how do you get there's no expiration date out of that? Oh, okay. So, well, two reasons principally. First, it states that there's free long-term Anchorage, and we interpret long-term to mean... I mean, there's a difference between long-term and in perpetuity. Long-term implies there's a term, you know, there's an expiration subject to the regulations. And that's certainly what the Port District has argued, but also if you look at the fact that it says, pursuant to the agreement that they would issue Mr. Gallagher a permit, if you look at the permit that they gave him pursuant to this agreement, it actually says expiration date in one box, and then in the next box next to it, it says no expiration date so long as the vessel passes normal inspections. So we believe that read together... Well, we believe read separately long-term Anchorage could also mean without expiration, but especially when you take into account that the agreement specifically incorporates by reference the permit that it would issue and the fact that the permit says no expiration date on its face. The permit issued at the time this was executed? It wasn't issued at the same time. It was issued a couple months later because I believe that Mr. Gallagher had to repair his boat. But it was issued to him pursuant to the agreement, but because before there was a settlement agreement they weren't allowing him to anchor at all. Thanks. So in terms of the retaliation claim, how do you respond to the fact that there was a fairly lengthy time between the protected act and the alleged act of retaliation, and in the interim the permit had been renewed several times? Well, I believe it was not renewed several times, but essentially this is what happens. There had been a time, a period of time in which Mr. Gallagher wasn't on the water, so the issue just never came up. That was for various reasons that weren't reflected in the record. But basically when he went to go put his boat in the water in, I want to say, the summer of 2006, essentially there's testimony on the record from both his deposition and also a statement by I think his officer Bishop to the effect that he was not recognized. So they didn't recognize him as the guy who had, you know, instigated all of these lawsuits against the Port District. They didn't recognize that he had won, you know, more than $200,000. That didn't go to him personally, but it went to charitable causes and for attorney's fees. They didn't recognize him, so they gave him a permit. It was no issue at the time. However, after the fact, basically when he went to go get his boat repaired or I think the proper term is inspected, that's when he started facing difficulties, and that was in the summer of 2007. And there's evidence in the record that at that point they recognized him. They realized that this was the guy that was the so-called, well, that he was a troublemaker, so to put it. For example, there's an email from April 2007 between two of the port officers that tells where they're basically discussing not to answer any of his calls without speaking to the port attorney before they do so. There's also the denial letter, which specifically references the settlement and the previous litigation. So while he had no trouble in 2006 and he had no trouble before then, that was mainly because he wasn't on the water at that time and he wasn't recognized in 2006. But by the time that the Port District was aware and put two and two together, that's when he started having trouble. Does he have a permit now? Well, yes, he does. Well, we believe he still has the permit, the 2001 permit that says it does not expire, but he was not allowed to anchor. According to the Port District, that permit is invalid and he has no access to the water. Well, the 2006 permit, which was issued in, what, November? Anyway, 2006. Yes. That's when he was able to bring the boat back. Yes. And then it was vandalized after that and taken out. But he did get a permit, and I'm looking at ER 48, and it's an A9 anchorage permit, July of 2006. It has expiration dates crossed out, and then it's reentered at the top as 01-2307, and up in the right-hand corner it says ADA. Now, you're talking about that's when you're saying he wasn't recognized? Exactly, because then he was just dealing with lower port officials, basically. But are you saying that they put an expiration date on that time when they didn't recognize him? So if it's a retaliation, one would think that he was getting treated in the normal course. Yes, he was getting treated in the normal course in 2006. They didn't realize that he had this settlement, or they may not have realized that he had this settlement that entitled him to an unexpiring permit. They saw something from 2001, perhaps, and they just thought he needed a permit, so they gave him a permit because that was before he was being treated like anyone else at that time. It's true. The question becomes later, and just to be clear, we don't believe we're not resting on the 2006 permit. We believe that it was probably issued in error, given that in 2001 he still had an expiring permit. Were there expiration under the eight regulations, were permits, did they have six-month expiry terms at that time? Yes, during both times, and it's reflected in the record, both in 2000 and when amended in 2006. There was always a general six-month requirement, which is why I would ask this court to consider why would the 2001 permit say under expiration date no expiration date, given that the rule at the time would have been six-month expiry. And we believe that's because he had this agreement with the court district that that was his bargain, that he would get to always anchor his boat in A-9. Now, yes, he would have to have it inspected, he would have to keep it in good order, but that was his essential right, and he actually didn't take cash from the settlement. The $100,000 went to Accessible San Diego, or at least according to the papers. What are you looking for now? Does he want to get a new permit? Is that what we're fighting about, basically? Well, there's actually several things. We would ask that this court would reverse with instructions to go to trial on the factual issue regarding retaliation. I haven't had an opportunity to get to it, but on his contract claims, we would like this court to find that he had an unexpiring permit. We think that you could do that as a matter of law, and then he would have access to the water again. We'd also like to reinstate our tortious breach of contract claim, so there could be damages involved, but his primary concern is getting back on the water. Do you want to reserve? Yes, I would like to reserve. Good morning, Your Honors. My name is Ellen Gross. I'm a Deputy Port Attorney with the San Diego Unified Port District, and I will be representing aptly respondent San Diego Unified Port District. To start my argument, I would like to read a quote from Justice Holmes that I think kind of takes this in a nutshell. And as he stated in Hudson County Water Company v. McCarter in 1908, one whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. And I think that that quote really fits here. I don't think Justice Holmes was talking about an ADA settlement. What bothers me about this case, counsel, is that this gentleman undertook to address an access problem at the port. There was litigation, and as part of the litigation settlement, he was given and others subject to ADA disability were given anchorage rights in a more accessible or inaccessible location. The initial permit, as counsel argued, that was issued set forth the notion that there was no expiration date on the permit, but he did have to comply with inspection rules, which are reasonable because they affect safety and sanitation. He then gets a permit later on that puts a six-month date in it, although you can explain why it was crossed out or if there's evidence about that. And then the port comes along and says, too bad, we're changing the regulations now that were incorporated, and we're going to eliminate these ADA accommodations. And as I understand it, there's a grandfather option, that is people who had the ADA existing permits, as long as they renewed them, they would still be able to have access to the port. Is that correct? Not entirely, Your Honor. Let me give you a little background on that. Ever since the A8 anchorage, the free long-term anchorage was first codified in August of 2000, which was about the time that the port and Mr. Gallagher were settling the anchoring claim in his initial federal litigation. There were already concerns about the A8 as a problem area. And the whole idea under Mr. Gallagher's state court action that he brought in 1998 was to say that the San Diego Port District's offering of the A8 as a free long-term anchorage, which is what it's called in the regulations, would constitute a program facility or service under the ADA. So Mr. Gallagher's whole lawsuit in the state court action was to say, hey, port, if you're going to do that for people who are able-bodied, and I show you that under the ADA I can't use your A8, you need to come up with a place for me. And so the resolution of the federal anchoring claim, federal litigation, that led to the third offer of judgment in November of 2000, was the port's agreement with plaintiff and his counsel at that time, that as the settlement, and this is in the notice of the third offer of judgment at ER 43, paragraph 1, which is kind of the intent, and it says that the A9 disabled anchorage was designated as an alternative free long-term anchorage area for qualified individuals with a disability who, because of that disability, are unable to use anchorage A8 area and who seek a reasonable accommodation in the port district's anchorage and mooring regulations. All regulations applicable to A8 shall apply to the use of the alternative anchorage area A9. So the whole idea of the settlement for Mr. Gallagher was to provide an alternative anchorage area to the program or facility service being offered by the port, which was the A8. Okay, a free long – we can debate what long-term means, but long-term implies – Well, I can tell you the reason why there's a distinction in the long-term, because there are several other anchorages in San Diego Bay that are considered short-term, and they are still open to everybody without cost, but they're only 72 hours. You still have to get approval. Okay, if I can finish what I was interested in. I apologize. I've got the language right here. So it says all regulations are applicable to A8 shall apply to the use of the alternative anchorage A9. So what you're saying is that he would get the permit as if he were at A8, but he would have his berth, his slot, at A9. Yes, Your Honor. Okay, and was there a six-month renewal provision at the time? Yes. Okay, then how do you explain that he had an issuance of a permit? Better let me finish my question. Issued a permit in implementation of the settlement agreement that said no expiration date. Well, Your Honor, the terms of the third offer was that he would receive a permit. The permit that he received in August 2001, it was issued on August 14, 2001, was done ministerially and was not done as a part of the settlement agreement. It is not attached to the third offer of judgment. It is not a part of the third offer of judgment. And where did he get the permit? He got it apparently from our port mooring office. It was provided, I don't even know because it's not signed, ostensibly by an employee of the mooring office. And the language that was put in there, no expiration as long as the vessel passes normal inspections, was quite reflective of the language that was currently set forth in San Diego Unified Port District Code Section 4.36 at the time, which was, yeah, you know, you need a permit, but as long as you do your inspection every six months, there shouldn't be a problem. And that was the state of the law at the time because at that moment, the long-term anchorage had just been kind of revitalized through this permit process, and it was the hopes of all the permittees in both the A8 and A9 anchorages that long-term free anchoring could be maintained on San Diego Bay. And that was the state of the law when he received that permit in 2001. However, it at no time was there, and has anyone ever said that there was no expiration date at all? Well, except one of your employees. Correct. I mean, with the proviso, though, that dependent on the vessel passing normal inspections, and that would tend to make it a conditional non-expiration if you would. I suspect he would agree with that. This wasn't revoked or not renewed because he didn't meet inspections. Is that correct? Yes, Your Honor, because he was never in the water. He never used the permit after receiving it on August 14, 2001. He never had his boat inspected? No, Your Honor. Was it canceled because he didn't get an inspection? It was just out of use. It was counted towards the number of permits that were allotted for A9 disabled anchorage users, so there was one less permit because it was kind of held out for Mr. Gallagher, but it was never used. It was not until 2006, July 24, 2006, when Mr. Gallagher came back to get his vessel inspected and then was given the permit with the expiration date of January 23, 2007. But you said it was never in the water. He brought it back in 2006. It wasn't in the water from 2001 to 2006. But he had a permit up until that point. Yes. All right. And it didn't have an expiration date on it? That 2001 permit did not have an expiration date. That was the one issued most immediately in time with regard to the settlement? Yes. All right. And you're giving us your gloss on what the facts are, but the fact is that the documents indicate that he got his initial permit concurrent with the settlement agreement that had no expiration date. Well, I would ---- Specifically written in. No expiration date as long as the vessel passes normal inspections. Well, I would disagree that it was concurrent and it was not made a part of the third offer of judgment. And also ---- Why doesn't that raise a tribal issue of fact? I mean, you've given us the port's view and maybe the correct view, and there are competing inferences, and here we are on summary judgment. Why doesn't all of this create a genuine issue of material fact about the effect of the document? Because the fact is that the law changed in July of 2006, and since the third offer of judgment said that it was still subject to all of the regulations according to the A8, then as of September of 2006, the law changed for the 4.36 code section that required all permittees to have to renew their permits. Okay. Let me stop you there. Let me ask you something that may be a little bit outside the record, but I'm curious. So what is the status of the A8 and A9 anchorage right now? You've got boats out there? We have no boats in the A8. In fact, we just received further grant funding to complete our environmental remediation of that. Okay. What about A9? The A9 is closed. It was closed along with the A8. We have no free and long-term anchoring available in San Diego Bay to this date. So there are no boats on either of those, and your position is that they are not allowed? The A9 anchorage still is considered a cruiser's anchorage, as was its original designation for out-of-county visitors that may stay permitted for up to 90 days. So no boats are allowed to dock at A9, and no boats are allowed to anchor at A8 at all? That's correct. Thank you. Does anyone else have any other questions? So I guess the effect is let's assume that he's correct and his permit didn't expire. You actually do have room at A9 to accommodate him. No, we can't, Your Honor, and let me tell you why, because what this would do is it would give him a benefit, a privilege, that no one else in San Diego Bay has. No, I'm not telling you. The argument is not whether it would be good or bad. I'm just saying you physically could do it. I don't know. That would not be my decision. Where do disabled boaters anchor? They can anchor wherever they can find a place. We do not have a special place. I thought that was what the former lawsuit was about. You had to somehow accommodate him. Yes, Your Honor, but it was only for the free, long-term aspect. We have many, many areas where people, disabled and able-bodied, can anchor. There are marinas. There are very inexpensive mooring buoys. There is also the two short-term anchorages that I mentioned in both Glorieta Bay, which is in Coronado, and in La Playa, which is in Shelter Island. But Mr. Gallagher's theme has always been about wanting the free, long-term anchoring. He doesn't want to pay any money for the anchoring, and that's why the A8 was very attractive to many, many people, and ultimately the attractiveness of it was also its downfall due to the debris and environmental issues and crime that occurred there. The San Diego Bay is also considered one of the EPA's hotspots for environmental contamination due to copper, and so the Port District is weighing evaluations about how to deal with marinas and boating issues concerning the environment as well. So we have to be able to maintain our police power under Section 55 of the Port Act to make and enforce regulations on anchoring, and a lot of that is to reduce the amount of time that long- and free-term anchoring can occur. So where do they, again, in answer to Judge Silverman's question, where is the accommodation being made now? Well, there is no accommodation for long-term free anchoring because we do not offer any free and long-term anchoring. So is there any accommodation for anchoring at all that's specifically designated for people with disabilities? No. And there are no plans to accommodate anyone with disabilities? I mean, you keep talking about different ports and vague stuff, but the port itself is not making an accommodation at the present time. Well, we've made numerous accommodations in terms of our landside access. We also have accessible dinghy docks. We've installed gangways that comply with Title 24 so people in wheelchairs can use the gangway to get down to the dinghy dock. People with disabilities who rent our mooring buoys may receive special priority in terms of the mooring buoy that they get to be next to in terms of how close it is to a dinghy dock or to another place where they can get from their vessel to the landside. Okay. Any further questions? Thank you. Thank you. Thank you, Your Honor. I won't take up too much of your time. I just wanted to respond to a couple of very small points and open up for questions if you have any more. With regards to Ms. Gross' point that there was a change in the language from 2000 to 2006 regarding the expiration date, there was no such change. It was always six months. I would direct your attention to pages 55 and 66 of the record. You can compare the language. I'm not sure how that helps you because the language of the settlement agreement is subject to all the regulations of A-8. And if A-8 had the renewal each six months, then what you have to hang your hat on is, A, interpreting long-term, as Judge Silverman pointed out, that implies that there is a term limit, and, two, that it is a modification or an exception created for Mr. Gallagher as evidenced by the initial permit, which is contradicted, of course, by the 2006 permit, which did, in fact, put in a six-month date. So that's a problem I have with the merits. The equities are substantial that the question is interpreting the agreement. I'd like the opportunity to address that, and thank you very much for bringing it up. The thing is that what's subject to all the regulations applicable to A-8, that is a very key question. But in our view, it means subject to the regulations regarding inspection, and here's why. The clause can't erase the preceding clause, which states free long-term anchorage in A-9. For example, the Port District contends that under the UPD code that A-8 is no longer free. It's $2,500. But if that's incorporated into this agreement, that would directly contradict the free aspect of the contract. And in California, we're supposed to interpret the language in a way that gives meaning to all of its terms. So by their interpretation, that would nullify that clause. And I think the same thing goes for the long term. Well, but what you're saying then is the offer of judgment commits them to always forever having A-9 as a free anchorage. Yes, for Mr. Gallagher. Just for him. Yes, because this was his settlement for the various claims that he had brought against them. They can't use their regulatory power over A-8 to eliminate the moorage at A-9? Exactly. We don't believe that this is just a simple thing where... Wait a minute. Oh, sorry. Okay, let me finish. Okay, because what you're saying, what it says, all regulations applicable to A-8 shall apply to his use of A-9. Presumably, regulations will evolve. Isn't that correct? That is true. Okay, so are they frozen in time for Mr. Gallagher? With respect to the free long term aspect of it, yes, because that's actually in the... That's your point? Yes. Okay. But I said... And in terms of... just wanted to round out the question. This was an ADA settlement. Exactly. But you have not alleged any violation of the ADA generally or of this agreement beyond Mr. Gallagher. Is that correct? That is correct. This case was tossed out on summary judgment, is that right? Yes. Are there facts in dispute or do you just... everybody agrees on the facts, you just disagree with the judge's legal conclusion? No, there are definitely facts in dispute. Can I take them off? What are they? Oh, certainly. Okay, so with respect to the motion for summary judgment, actually there was a motion for summary judgment and there was a motion to dismiss. The contract claims tortious breach of contract claim. What facts are in dispute? Okay. Well, the facts in dispute are whether or not there's evidence of retaliation. Basically, the court said that below, because the plaintiff was able to obtain a permit in July of 2006, that there was no evidence of retaliation. We believe there's actually a factual issue and there are lots of facts that show that they would have been, that they could have been motivated by a retaliatory motive. Such as? Such as, for example, the way that they treated him in 2006 when they were presumably unaware of who he was, and then in 2007 when emails were exchanged telling them not to answer his calls, to consult with an attorney before they spoke with him, and denying the anchorage despite the plain language of his 2001 permit that said no expiration date. Another fact in dispute would be what? Well, basically, we're not disputing, I guess you're correct in that we're not disputing the actual facts as they occurred, but what can be inferred from them. Because in a discrimination case, there's no, I mean, there's, sometimes there's evidence of direct discrimination and sometimes things have to be inferred. And we're saying that there's enough facts here that a jury, a reasonable jury, could infer that there was retaliation. So we start, you get past stage one, they've given a legitimate non-discriminatory reason at stage two. Exactly. What's the best evidence of pretext? I think the best evidence of pretext is just the actual explanations that they gave, which is the permit expired, and then you look at the actual permit that they claim expired, and it says under expiration date, no expiration date. And to my mind, when you say on one side. Wait a minute. He got a permit in 2006 that had an expiration date, and then he didn't renew within the six months, correct? If he had renewed within the six months, his permit would have still been extant when the regulations changed, because, correct me if I'm wrong, but my understanding is if he hadn't let it go beyond the six months, he could have then stayed in AA because the proviso was that existing permits would be kept, maintained so long as they were renewed on a timely basis, correct? Yes, but I would just make two points towards that. I think if you actually look at the permit, it's kind of confusing. Things are scribbled out. What's scribbled out appears to be a date in 2007, and if that date for the expiration date actually applied, he would have been well within. When he came in early 2007, he actually would have been within the time period, because if you look at the actual thing where it's scribbled out, it appears to say a date of, I'm sorry, I don't have it before me. It looks like 12407. I thought it said 7. It says 07. It says 24. I just don't know what. I think it says, because it also says one year. If you look at it, it says one year expiration date. Where is that? It is right above where it says expiration date and where it's scribbled out. It says one year expiration, and then because this was issued in July 24, 2006, it would make sense that that says July 24, 2007 in the one year, but then it's scribbled out, and then something's written above it. And so I think there's actually a little bit of a factual issue as to whether or not it expired for the 2006 permit, but I would say that I don't think it's necessary to rely on it, because if he had a valid permit in 2001 and it was still valid, what difference does it make if they give him a new permit in error? I don't see where that would invalidate the 2001 permit that's unexpiring. Well, unless it's an ovation. Do you agree with the port's representation as the status of A8 and A9, or do you know? No, I don't know. It's not reflected in the record. I just want to give you an opportunity. I appreciate that. And are there any questions that you have? Thank you very much. Okay, thank you very much for your time. Thank you, both. Thanks for taking this pro bono case. Yes. And to do that, and Judge Silverman, thanks so much for taking this pro bono. Next case on the oral argument calendar is Dennis v. Hart. Always tough to be last on the calendar, I know. It's the slice of our life, though. Feel free to weigh on any of the cases. They only have 20 minutes. Deep breath.
judges: Thomas, Silverman, Fisher